There's a lot of issues that are raised in this case, but first and foremost, the most clear issue that mandates reversal is the one dealing with the loss of the opportunity to present a defense on the state of mind of Ms. Hunter concerning the possession of a gun. The majority of the access devices and identity documents that were found at her residence. Why did the district court abuse its discretion under the rules of evidence 8032 and just general hearsay in precluding you from doing it in the way that you proposed? It seems to me the easiest way to do it would have been to put Ms. Hunter on the stand and have her testify, which the district court said he was willing to do. The court did indicate that, and in doing so, validated the fact that state of mind evidence would be relevant in the case in defense of the identification statutes. It was not just 803, but it was also 701 and 704 dealing with lay opinion testimony. And I think the problem was, was that at the beginning of the pretrial litigation, the defense was attempting to assert, or at least the government believed the defense was seeking to assert a duress defense. And so, therefore, everybody's focus was on duress. And yet, even during the pretrial motion in Lemonade to preclude that defense, it was conceded by the defense counsel that there was not sufficient evidence to put forward a duress defense. And yet, as early as those pretrial proceedings, he did identify that he was considering something short of that, which would relate to state of mind, which does not require pretrial notification. So... That's true, but part of it, I mean, state of mind is a tricky exception to the hearsay rule. It generally requires temporal proximity to the conduct at issue, an excited utterance. And it is generally, the rule of evidence generally does not encompass after-the-fact observations of what the declarant may or may not have been thinking at the time. Isn't that a correct statement of the rule of evidence? That's true. But the defense was that the majority of these documents were actually held before the limitations period in what the government called the toolbox. And that they were just sitting there, lying dormant. Now, concededly, some of the documents were used to commit aggravated identity theft and could be counted as part of the calculus for 15 or more or five or more, depending on which statute you're looking to. But the as far as state of mind goes, because there's both state of mind and lay opinion, as far as state of mind goes, the statements that Ms. Hunter may have made concerning her fears would have been relevant at the time she was in possession of the documents. There was no opportunity to really develop that testimony in her daughter's testimony or to develop that testimony in the trainer's testimony, Mr. Kennington. So if, I'm not sure the government could have it both ways. If the government's going to maintain that the possession was a continuing offense, then certainly her statements during the continuity of her possession would be relevant. But beyond that, the lay opinion testimony. Help me understand the defense. The defense was she used false identities in order to protect herself from a former lover who may have been stalking her? Right. An abusive, former abusive relationship. Okay. And the government's theory was she was using a number of different false identifications in order to mask the importation of HGH into the United States. She was using three of the identities in order to do that or, yes. And in addition to that, she actively used some of the credit cards in order to run up charges. But there were only two credit cards that were used for that purpose. But the evidence did show that she used different false identities throughout, right? Well, she concentrated on the use of five identities primarily. Dina Russ, Julia Forbes, and Mary Horn in relation to the HGH scheme. And then Dorothy Moore and Gerald Krieger for the credit card transactions. The rest of the identification documents were not used in any manner that was shown. They were found in the apartment. Some of them were found in her purse. I'm not sure what great distinction there is between being in the apartment and being in her purse in terms of her specific intent. But in terms of the five core documents that she used, fraudulently, those were the ones. Though that gets to a sufficiency of the evidence argument, right, where we have a very low standard under Jackson v. Virginia for what the jury could reasonably believe. Well, it does. But before you get to the sufficiency of the evidence issue, you have to determine whether the defense was given an opportunity to present credible evidence, which would counter the position that was taken by the government in finding her guilty of those offenses. What I understood, and you can correct me on this, is that at least for the trainer, the concern was that the testimony was not going to be that Ronna Hunter said I'm afraid, but that he was going to give this basically recite her story about her fears of her husband and why she was therefore using these false identities, and so therefore not going into the state of mind, but into some explanation that's not allowed under our decision in Emmert. I think what Kennington was trying to do or what the counsel was trying to elicit from Kennington dealt with his rationally based perceptions of Hunter and trying to convince the court that they were relevant to a determination of a fact, an issue in the case, and that Kennington wasn't an expert. So he could render a lay opinion as to what he felt was her fear factor, because he got into the testimony was cut off, and so there was not really an opportunity to make a clear record through the testimony as to what he was going to testify to. But that was the Rule 803.3 state of mind exception that was being claimed, right, which the district court said is limited to statements about state of mind, and the district court said this is going into reiterating her story about why she was doing what she was doing. Well, but I don't think we can limit it to just the 803 aspect as, you know, where the court was saying this is in violation of hearsay and the only person who can testify would be the defendant. I mean, on that score, there are cases that indicate that, you know, sometimes the hearsay rule still has to be adhered to, but what's more important is whether the defendant has any opportunity to present anything. Well, she could have taken the scam. That was the district court's point. And then the jury was in the same position as the witnesses to evaluate her story and whether that was the real reason for her state of mind for the identity documents. That was the district court's position, if I'm understanding correctly. That is correct. But, again, to let to limit the defense to taking her testimony in a vacuum, the appellant maintains would be violative of Washington v. Texas and the chamber's decision and other case law which discusses the ability to completely develop the defense through corroborating testimony, through the evidence of disinterested witnesses in the person of Kennington and in the case of the daughter, somebody who was less interested in the outcome of the proceedings as Ms. Hunter. And so she was concerned in taking the stand by herself that without any support that that wouldn't be enough. And this is why she wanted to be able to develop that testimony, which she maintained was relevant and admissible. Could I direct your attention to a different issue which I was concerned about? One of the arguments you make on a jury instruction issue is whether the court was mistaken in not defining the contrary to law element of the smuggling in Counts 6 and 7, so a violation of Section 545. And the jury instruction talks about that as contrary to customs law and then it says contrary to law. What were you to – what had you asked the district court to present? Did you ask for the district court to instruct on what law was the contrary to law? Well, what Ms. Hunter had asked for at the point the jury note was received was for the court to comply with their request, because one can't speculate when a jury is in deliberation as to whether they're actually struggling with a particular issue or simply want a complete explanation of what is contained in the indictment. For the 545 offenses, there were a number of predicate statutes that were listed at the bottom, and the government clarified that only one of them was actually relevant to the proceedings, and that was 355. And so – And that was the instruction on the elements of 355 that they were given in a different instruction. They were never actually given any instructions concerning 355. They were only given the general Ninth Circuit model jury instruction for smuggling, which says that it has to be contrary to law. Okay. But I guess the answer – I'm curious. I think what Judge Acuda was asking is, did defense counsel, when the jury sent out the no proposed language to the district court in response? He didn't need to, because all the jury wanted at that point was a reading of the statute. Okay. Had you argued, had defense argued that for that count, that there hadn't been proof or that, in fact, the importation had not been contrary to law? Yes. The defense did argue it in the following way. First of all, as you know, Ms. Hunter was not the one who allegedly imported HGH from the People's Republic of China. Before you even get to that, we maintain that there's no evidence to show that the HGH that was seized in the case actually came from the People's Republic of China because there were Internet sales of homeopathic HGH. But in terms – in answering your specific question, the argument to the jury was that they – that the government had failed to show that there had been a violation of the attainment of NDA approval for the HGH which was seized, and that 355A requires specifically that no one can introduce or deliver any new drug unless there's approval of an application file. So for Section 545, the government had to show that she – as I read it, that she knew that the merchandise had been imported contrary to law. And so there had to have been evidence that Ms. Hunter knew that the importation by whoever it was that imported it, Chinese company or whoever, violated the Section 355. Is that correct? Well, it had to be shown that the importation violated that section. Okay, and so was there evidence that the government introduced showing that the – that she knew that the Chinese company or whoever had imported it without – in violation of that section without approval? Not specifically. What they did have was they had statements that she made to one of the agents. I think it was an unrecorded statement that she knew that importation was unlawful. So they had evidence that she thought or knew it was unlawful. Did they have evidence that it was actually unlawful? What was the evidence that it was actually unlawful? The evidence that it was actually unlawful, you see, came from the testimony of the one government expert, Dragos – I'm sorry, Roman, I believe it was, from the FDA, and also from the 244B witnesses who testified to seizures of untested, suspected contraband in Ohio and at LAX, who were saying that it's illegal – the importation of HGH is illegal. As far as Roman was concerned, it was because no PRC manufacturer had ever obtained NDA approval to his knowledge, and as far as the other two were concerned, it was just the fact that they were seizing it. And the argument that was made in the Moran case, which was cited in both parties' briefs, is the fact that the experts shouldn't be, you know, making – that shouldn't be what the jury relies upon in making its determination as to guilt or innocence. It should be the judge's province to instruct properly on what was contrary to law. And so when the jurors asked for the statutes, they wanted to know how specifically the importation of the HGH was contrary to law, because the statutes that were claimed to have been violated were contained right in the count, but they had never been further explained. All the jury had was the statutes by title and number. So they wanted to know, you know, what is it specifically. And that was contested – in terms of 355A, that was contested in argument at the close of the case by the defense, because they were saying, well, that wasn't – you know, that really hasn't been shown. Maybe it was shown, but they – not in an overwhelming sense. And certainly the jurors, I think, were hung up on how it was unlawful, since you had other evidence concerning how you can obtain HGH through commerce, you know, through the Internet and the like. I've got three minutes left. I'd like to reserve it. You want to reserve it? Thank you, Your Honor. All right. Very well. We'll hear from the argument. Good morning to the Court. My name is Harvinder Anand. I represent the United States. May it please the Court. Your Honors, I'll discuss first the issue regarding the alleged failure or the alleged preclusion of a defense. What happened here was that the defendant was precluded in pretrial from eliciting a duress defense because it was legally insufficient. At trial, defendant attempted to do an end run around the district court's pretrial ruling, and the district court correctly precluded the defendant's hearsay statements through two witnesses, and because the preclusion of the testimony was correct and proper, there was no improper preclusion of a defense in this case. With regard to Kennington, the proffer that was made was that Kennington had met Ronna Hunter approximately 10 years earlier, and that when he first met Ronna Hunter, she went by the name Paula. And Kennington testified that at some point, without specifying when, but at some point she said to him that her name was Ronna Hunter, and purportedly she was using a different name because of some fear factor. The district court precluded that testimony because what the defense was trying to do through Kennington was introduce defendant's hearsay statements about why she purportedly possessed these identification documents. And that was proper because under 8033, number one, you cannot, as the court said earlier, a defendant cannot introduce the purported reasons underlying a condition, a mental condition. And number two, the foundational requirements were not met because the purported statement that was made was not made contemporaneously and without a chance for reflection. So what the district court correctly said was that the defense was trying through Kennington to get in defendant's purported reasons for possessing these documents. Kennington had no way to know that except for defendant's statements. It constituted classic hearsay and therefore was properly precluded. With regard to the daughter, there were even more problems because the same, what was proffered with respect to the daughter was not even any statements of the defendant. What was proffered were purported abusive actions that had been taken against the defendant and the proffer was really vague and ambiguous and far attenuated from the events in this case because the defendant was purportedly going to testify about abuse that went back to the defendant's teenage years and even to the mid-1990s. Some of that testimony necessarily would have had to have been hearsay because, of course, the daughter would have had no way to know that the defendant, her mother, had actually been abused by her parents during her teenage years. So some of that necessarily would have been hearsay. But putting that aside, Your Honors, the same problems that I just mentioned with regard to the state of mind for Kennington, the same analysis would apply to the daughter and then when we get to the lay opinion, there was never raised in the district court, there was never a proffer made by the defense that the testimony was being offered under as lay opinion. The words lay opinion never appear in the record. Indeed, the word opinion never even appears in the record when it comes to the testimony proffered by the daughter. And then, moreover, when you look at the substance of the opinion that the defense wanted to elicit, which is that the defendant purportedly was holding these documents as a means of protection, that's not a proper opinion. It's not a proper lay opinion because, again, the daughter would have had no reason to know, except for the defendant's own statements, why she was holding these documents. So it's not a proper lay opinion and it was never proffered as lay opinion. So the district court quite correctly recognized that what was trying to be done with regard to both Kennington and the daughter was an end run around the pretrial ruling precluding a duress defense, and so both sets of testimony were properly precluded. And this court has held in Perkins and in other cases that where testimony is inadmissible because it is not relevant or it's improperly precluded on 403 grounds, that that does not constitute a due process violation. A defendant is not improperly. Can you turn to this jury instruction issue, which I'm concerned about? Because we've said under Olay-Castro that for 545, this contrary to law piece is actually an element that has to be instructed to the jury. The district court didn't explain contrary to law, and when the jury asked, the district court didn't give the jury the statutes. So is this an error under Olay-Castro for failure to instruct on an element of the offense? Your Honor, the government's position is there was no error here. Olay-Castro, as I read it, didn't require that, didn't state that contrary to law is an element. It stated that the statute that is alleged to have been violated should be included in an indictment. And it was, that was done here. So it says the fourth element is not complete in itself. It's necessary to look elsewhere. And so that, at least to me, suggests that the statute that it's, that is contrary to, that the imputation is contrary to, is part of that fourth element. And the omission of that seems to leave out a part of the element of that crime. Your Honor, the government's position is that the two elements taken together essentially instructed the jury as to what was contrary to law. The case was tried on a single theory, the theory being that importing HGH into the United States was illegal and in violation of customs law. That's what was in the first element. So the customs law was in there. But now you're saying that it was actually in violation of 355A. Am I misunderstanding that? We are saying that it's in violation of 355A. And there was testimony, abundant testimony, that essentially to the same thing that what 355A says. 355A says that it is, that a person is prohibited from introducing a drug into interstate commerce without FDA approval. The FDA expert testified to that. And then, indeed, defense counsel elicited that same testimony from one of the law enforcement. And so what was the evidence that the drug that was purchased by Ms. Hunter, by the defendant, had been introduced without, which was a new drug and had been introduced without the necessary application? The evidence was that Dragos Roman, who was an FDA expert, and his job was to approve all new drug applications for HGH. He testified, number one, that he had never heard of Westgate. But Westgate's not the importer. Westgate's just a distributor. So that's irrelevant, isn't it? Well, it's part of the ---- Because this is the no person shall introduce goes to the importer is my understanding. Well, that's part of the analysis, Your Honor, because what the defense is relying upon is they say the defense at trial was that Westgate was not required to receive approval because it was just a distributor. Well, it wasn't under 355A, or was it? Was it required under 355A, or was it just receiving the drug? It was required under 355A because the other thing that the FDA expert testified to was that no company from the People's Republic of China had received approval from the FDA to manufacture HGH in China and then to market or distribute it in the United States. And was there evidence that it wasn't just like in Canada where the American companies sell to Canada and then it's gray marketed back here? How do we know it wasn't Merck selling to Canada and it was gray to China and it was gray marketed back here? Was there evidence to that effect? There was substantial evidence to that effect because the two distribution charges I'm sorry, the two smuggling charges, Count 6 and 7, the first one, 6, was a smuggling charge on July 11, 2008, and Count 7 was July 14, 2008. The evidence was that on July 9, 2008, the undercover officer called the defendant in a recorded conversation and ordered HGH. The defendant's statements were, number one, my stuff is from China. Number two, my HGH is currently in customs. I'm not sure it's going to clear. Number three, I lose some of my shipments in customs. And number four, I lose one out of three of my shipments in customs. And technically, does that mean that it must have been manufactured in China? It couldn't have been manufactured somewhere else and then was imported from China? Is there a technical reason why that shows it was manufactured in China? It appears it was manufactured in China because there was never any reference made to, for example, the gray market from Canada, Your Honor. Aside from what I just talked about, so that happens on July 9. On July 11, the defendant calls the undercover officer and says, my shipment has cleared. It's come through. Now you can send me the money. But I guess I don't understand how that relates to the question of whether the drug was a new drug without an approval. You're just saying that it was from China. There was evidence in the record that it was shipped from China, but was there evidence in the record that it was manufactured in China? Well, there was no direct statement by anybody that it was manufactured in China, but the defendant's statement that my stuff is from China, and in fact what happens is the defendant sent payment to China for her HGH, that necessarily led to a very strong implication that the drugs were being manufactured in China. Is there anything that requires the drugs to have been manufactured in China? There's nothing that requires the drugs to have been manufactured in China. The smuggling charges require that the government-approved merchandise was brought into the United States. We just have to prove that it came from the United States. But you have to prove it was a new drug, right? That it was a new drug without an approval. Yes. So what was the evidence that it was a new drug without approval? Because the FDA expert testified that there were approximately six to eight or maybe nine HGH drug applications that had been approved. All of the companies he gave were United States companies. And none of them were in China. So you have to show that it was manufactured in China, right? Because if it was manufactured in the United States, sold in China, and imported back, it wouldn't have been a violation of 355. I don't think we have to show that it was manufactured in China. The government was required to show that it was. It was not manufactured in the United States is what you're saying. Yes. And so did you show that? Was there evidence to that effect, that it was not from one of these nine companies? Yes, Your Honor, because the FDA expert drug was Roman, listed all of the companies. And he said, I know this material, these vials, were not manufactured from any of these nine. Was there that evidence? It wasn't said in that way. What Douglas Roman testified was he's never heard of Westgate distributors. Well, that's a distributor, not the manufacturer, right? But he's also never heard of any manufacturer that he's – there was never a manufacturer in China that was approved to distribute – to manufacture and then distribute in the U.S. Okay. But what I'm hearing from you is that there was no evidence that those nine companies had not manufactured the particular drug at issue. You didn't have any specific evidence on that point. Is that correct? There was no evidence that the drugs that the defendant brought into the United States were not manufactured by one of the companies. Okay. Thank you. That's correct. Thank you. Counsel, am I also correct? Did the record also show that at least one of these shipments involved masking the contents of the shipment in lays or something from Hawaii? There was a couple of those, Your Honor. There was testimony about two seizures at the border. One was in July 2007, one was in November 2007. Both of them were attempted to be brought into the United States with false identifications and the manifests, they were false. They were purported to be things that they weren't. One manifest said iron oxide. That also went to support the allegation that the defendant knew this was illegal. She was using – in fact, when you look at Westgate Distributors, the entire business was a sham because the defendant used layers of identity to conduct every aspect of her business. No aspect of the business was in her own name. So she thought it was – she certainly thought it was illegal. There was plenty of evidence. My only concern is how do we know it was a violation of 355A because that's what the government is now relying on? We know it's a violation of 355A when you look at everything, Your Honor. Number one, Westgate Distributors didn't have any authority, didn't have a new drug application. Number two – Well, they don't have to, though. I guess I'm still very puzzled by that because they're not the manufacturer or the importer. They're just distributing it. They're not required under 355A, is how I read it, to have such an approval. That's correct. Why do you keep saying that's evidence? I just want to make clear that Westgate didn't have authority, nor did it have authority. The exception to the rule is if you're a distributor but you're getting drugs that have been approved by a manufacturer, then you don't need approval. But the exception doesn't apply to the defendant here because, number one, there was no approved manufacturer in China, and number two, the companies that had been approved, the FDA expert listed them. He listed all the drugs that had been approved, and there was necessarily the conclusion from all of this evidence that the defendant did not have the authority to bring these drugs into the United States because it wasn't coming from an approved company, and number two, the way she ran her business, which was through numerous, numerous false identities and smuggling drugs into the country. In fact, the defendant's own statements were in the fall of 2007 where she knew it was illegal to sell HGH into the United States. She knew that her shipments were being seized by customs. Those were her statements in the fall of 2007, and then she made statements in 2008 prior to the first sale to the undercover, which was I'm having trouble getting it right now, and then in July, followed up by my stuff is from China. I don't know if it's going to clear customs. I lose one out of three in customs. So was there evidence that none of the nine approved U.S. companies, that none of them ever sold to China? Was there evidence to that effect? There was no evidence to that effect, Your Honor. Okay. Thanks. Your Honor, unless the Court has any questions with regard to those two issues, I'll move on to the sufficiency argument. The sufficiency argument, the constant theme is that the defense is attempting to re-argue the weight of the evidence, which is, of course, improper under levels. With regard to Count 5, there was testimony that explained why there was a difference in weights for one of the vials. The jury was free to accept that testimony, and it apparently did so. The Court has to resolve all inferences, competing inferences, in the government's favor. A rational juror could have found that testimony to be sufficient, so there's Count 5 is fine. Count 8, similar. The argument being that, for Count 8, that there was a discrepancy in the dates. The chemist clarified that he misspoke about one of the dates of testing. Again, the jury was free to accept that testimony. Regarding the use argument for the identity theft allegations, I'd like to go to that, Your Honor. There was a lot of evidence in this case about the defendant's use of identities, apart from the ones mentioned by defense counsel. There was, for example, Patricia Costin. Patricia Costin, the defendant acquired Patricia Costin's birth certificate and Social Security card in 1973. And then in 2005 and 2006, the defendant used Patricia Costin's identification to obtain credit cards and to open a bank account. From that evidence, a jury was free to infer that the defendant kept identification documents for decades and used those documents decades later. It was obviously free to draw that conclusion with respect to the rest of the identifications that the defendant kept. And she kept quite a few. There were over 25 victims whose identification information she was keeping. Your Honors, I have a minute and a half left, but unless the Court has any questions, I will prepare to submit. Judge Rimer, anything? No, thanks. Okay, very well. Mr. Schlesinger, I think you've reserved a little time. Thank you. Very quickly. In terms of the request by the jury for the explanation of the predicate statutes for the smuggling charges, counsel just said here that the testimony that was received from its experts or its agents was that the HGH was imported in violation of the customs laws, but the laws that the indictment identified were these specific statutes that deal with FDA approvals or misbranding or failure to register or failure to identify, so failure to make notifications that are required by statute when you're marketing certain drugs. There was no allegation of customs laws, so that would have been, I guess, a variance to what was alleged in the counts of conviction as it was presented to the jury. The same way, as far as the identification fraud counts are concerned, as you can recall, the way it was prosecuted and the way it was instructed, skipping over to those now, the aggravated identity theft counts were tethered to the access device and ID document counts, and the jurors were instructed that you can't even get to the aggravated identity fraud counts unless you are satisfied that the defendant is guilty of the predicate offenses in counts 9 and 11, respectively. This all goes back to what I said at the beginning of my argument, was that the court did not permit Hunter to present witnesses who had an alternative explanation to the government as to why she kept the majority of these documents in the toolbox, the majority of which were never taken out of the toolbox, the majority of which predated even the limitations period, and there were explanations to be made. If we reject your argument that the manner in which the evidence was proffered was properly excluded under the rules of evidence, how else would you have introduced that evidence without putting Hunter on the stand? And even her testimony might have been limited, depending on what it was that she purported to say. Well, I found seven distinct places in the transcripts where the defense made a sufficient proffer that it was seeking to admit the testimony for state of mind and lay opinion. And in reference to the daughter at excerpts of Record 25, the defense counsel said Malia Hunter could establish things that happened when she was with her mother and things that she has seen and things that she can testify about from personal knowledge, not necessarily hearsay, I mean things she actually witnessed, saw, and heard. And this is through a continuum of their relationship as mother and daughter, not just ten years earlier, but up to the date of the arrest. So from that as a foundation, if that had been permitted, and as a foundation to Malia Hunter's testimony, the defense would have been able to obtain her lay opinion as under 704 and under 701 as to why Ms. Hunter possessed the majority of the documents, which was for a non-felonious purpose, was because of this fear factor as we've talked about. And that really should have been permitted. I'm not saying that the jury at the end of the day would have found her not guilty, but to make it a level playing field, at the bare minimum, Malia Hunter should have been allowed to testify on that score. I think we have your argument well in mind. Thank you very much. You're over time. Thank you, Mr. Schlesinger. The case is submitted and we're in adjournment. All rise. This session is now adjourned.
judges: Rymer, Tallman, Ikuta, Cjj